IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| JEREMY R. MYERS, | CV 14–248–M–DLC |
| Plaintiff/Counter-Defendant, | |
| vs. | ORDER |
| HOWMEDICA OSTEONICS CORP. D/B/A STRYKER ORTHOPAEDICS, | |
| Defendant/Counter-Plaintiff. | |

Before the Court are the parties' cross-motions for summary judgment. On December 18, 2015, Defendant/Counter-Plaintiff Howmedica Osteonics Corp. d/b/a Stryker Orthopedics ("Stryker") filed a motion for judgment as a matter of law with regard to the wrongful discharge claim brought by Plaintiff/Counter-Defendant Jeremy R. Myers ("Myers"). On the same day, Myers filed a motion for judgment as a matter of law with regard to Stryker's counterclaim. For the reasons explained below, the Court grants Stryker's motion and denies Myers's motion.

## BACKGROUND

Stryker, a medical device and equipment manufacturer, terminated Myers on December 10, 2013, following an investigation into Myers's professional conduct. Myers had begun working for Stryker in 2005 as a sales representative, selling

Stryker products to doctors throughout Montana and nearby states. In July, 2010, Stryker promoted Myers to the position of Sales Manager for Stryker's Northwest Branch. Shortly after accepting the promotion, Myers signed a contract including, among other provisions, confidentiality and non-competition obligations. Myers agreed to be bound by those obligations for a year following termination of his employment.

Myers acknowledged that he received and read Stryker's employee handbook and its code of conduct during his employment. Stryker's personnel documents prohibit workplace harassment and promote ethical behavior. The company's published policies also established that Stryker may terminate an employee for violating company policies.

Myers's sales territory performed well under his leadership, and he was rated as outstanding in his 2013 performance review. Toward the end of that year, however, his manager, Scott Curtis ("Curtis"), and human resources manager, Jenny Lavey ("Lavey"), became concerned about Myers's behavior. Following several customer and employee complaints, Curtis and Lavey conducted an investigation into Myers's professional conduct. Immediately following the investigation, and without discussing the matter with Myers, Stryker terminated Myers's employment.

In the summer of 2013, Myers advocated for the termination of Justin Auch ("Auch"), a salesperson within his region. Curtis followed Myers's advice and discharged Auch. Curtis was surprised by the volume and negativity of feedback he received from other employees and customers regarding Auch's termination. The complaints questioned Myers's fitness to manage a sales team and suggested that Myers's continued employment would threaten Stryker's relationships with employees and customers. One doctor removed all of his business from Stryker.

Upon fielding complaints about Myers, Curtis traveled from his workplace, Denver, Colorado, to Montana to speak with the customers and employees who worked closely with Myers. Over the course of several weeks, Curtis heard from many of Myers's subordinates that Myers managed them through intimidation, harassment, and demands for money and services. Stryker's Operations Manager told Curtis that she had personally witnessed Myers behave aggressively and unprofessionally with her team of employees and with others. Curtis viewed the behavior described as serious, unusual, and unacceptable.

Conversations with customers similarly concerned Curtis. He learned that Myers had been banned from a hospital for 30 days for failing to sign in at the front desk and that Myers had not disclosed the disciplinary measure. Several customers stated that they would remove all of their business from Stryker to

avoid working directly with Myers. Another described Myers bullying a hospital CFO.

Curtis notified Lavey of his conversations with employees and customers and asked her to conduct an investigation. Over several days, Lavey interviewed employees who worked with Myers and documented those interviews. The individuals interviewed corroborated the information compiled by Curtis. Lavey determined—and Curtis agreed—that Myers's misconduct was so egregious and extensive that discharge was necessary. Curtis and Lavey recommended Myers's termination to their respective managers. On December 10, 2013, Curtis and Lavey met with Myers and notified him that he was being terminated and gave a general explanation of the reasons. After Myers's termination, Stryker rehired Auch.

In May, 2014—seven months before expiration of Myers's contractual obligations—Myers took a job with Zimmer, Inc. ("Zimmer"), which manufactures and sells products competitive to Stryker's within the same markets.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is required when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of

showing that no genuine dispute exists. The burden then shifts to the non-moving party to present affirmative evidence showing the existence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

Summary judgment is warranted when the documentary evidence produced by the parties permits only one conclusion. *Id.* at 251. Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248. In ruling on a motion for summary judgment, a court must view the evidence "in the light most favorable to the opposing party." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 1863 (quoting *Anderson*, 477 U.S. at 255).

## ANALYSIS

## I. WRONGFUL DISCHARGE CLAIM

Myers brings a wrongful discharge claim under Montana's Wrongful Discharge from Employment Act ("WDEA"). Mont. Code Ann. §§ 39–2–901 to 39–2–915 (2015). The parties agree that Myers was not a probationary employee. Under the WDEA, an employer's discharge of a non-probationary employee is

lawful if: (1) the employer did not retaliate against the employee for protected activities; (2) the employer had good cause to terminate the employee; and (3) the employer did not violate his own personnel policies. § 39–2–904. Myers does not claim that his discharge was retaliatory. Rather, he raises three alternative theories for wrongful discharge. First, he asserts that Stryker lacked good cause for his termination. Second, he argues that Stryker's purported good cause reason is a pretext and that the true reason for his discharge is unlawful. And third, he claims that even if Stryker can show good cause, Stryker violated the provisions of its own personnel policies when it terminated him.

### A.    Admissibility of Stryker's Affidavits

As a threshold issue, the Court must determine whether it may consider affidavits submitted by Stryker. Stryker supports its motion for summary judgment with affidavits from Curtis, Myers's immediate supervisor, and Lavey, a human resources manager. These affidavits detail statements made to Curtis and Lavey by Stryker employees in the course of Stryker's investigation into Myers's employment. Myers argues that the content within the affidavits should not be considered because it would be inadmissible at trial. Myers's argument is unsuccessful.

Myers asserts that the affidavits contain inadmissible hearsay. Evidence is

inadmissible for purposes of summary judgment if it is inadmissible at trial. Fed. R. Civ. P. 56(c), (e). Hearsay is generally inadmissible. Fed. R. Evid. 802. "'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c).

Curtis's and Lavey's affidavits do not contain improper hearsay evidence because the statements contained within are not offered for "the truth of the matter asserted." Stryker submitted the affidavits not to prove that Myers was a bad employee but to demonstrate that Stryker conducted an investigation and discharged Myers for good cause based on what it learned during that investigation.

Myers further argues that the affidavits cannot be considered because they lack sufficient specificity. To support his argument, Myers cites to a case out of the Eastern District of Washington, *Wright v. Merk*, for the proposition that "non-specific facts in affidavits are not sufficient to support or undermine a claim." 205 WL 4576962, *3 (E.D. Wash. 2015). The quoted language derives from *Lujan v. National Wildlife Federation* and is an interpretation of an earlier version of Federal Rule of Civil Procedure 56(e) that expressly required specificity. 497 U.S. 871, 888–89 (1990). Rule 56 has since been amended; the only requirements for

affidavits are that they are "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). If the nonmoving party is unable to find evidence to raise a factual dispute, Rule 56(d) provides for remedies in the event the nonmoving party "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."

Myers claims that Curtis's affidavit should not be considered because Curtis does not specifically identify the employees and customers who reported concerns to Curtis. Myers asserts that Curtis names only one employee, Zac Anderson, claiming the "bulk of Curtis' affidavit alleges that he talked to a bunch of people he did not identify, and that they had various, generalized concerns which he barely articulates." (Doc. 51 at 12.) Although Curtis does not refer to other employees by name, he refers to them by job title, giving Myers sufficient awareness of each individual to allow him to refute the facts. For example, Curtis describes fielding complaints about Myers from "the Spine Sales Manager and the Manager for Endoscopy and Surgical Products" and the "sales representatives on Myers' team." (Doc. 41–2 at 39–41.) Myers's sales team was not large, and the employees were sufficiently identified.

Curtis's affidavit is less clear in its description of certain customer

complaints.  Curtis refers to complaints from "[a]t least two doctors and one

hospital administrator," as well as from "[o]ne hospital surgical manager."  (Doc

41–2 at 42.)  Although the complaints are described in detail, Curtis's failure to

name the complaining individuals could conceivably make it difficult for Myers to

reach out to the same individuals to secure evidence showing a factual dispute as

to the claims.  However, Myers has had the opportunity to learn the names of the

individuals described in the affidavit through the discovery process.  Myers has

not demonstrated that "for specified reasons, [he] cannot present facts essential to

justify [his] opposition" to the statements described in Curtis's affidavit.  Fed. R.

Civ. P. 56(d).

Curtis's affidavit appears to meet the requirements of Rule 56(c)(4).  It is

based on Curtis's personal knowledge of his conversations with employees and

customers.  The facts in the affidavit are presumably admissible at trial; as noted

above, the affidavit does not contain hearsay, and Myers has raised no other

evidentiary objection.  Nor has Myers asserted that Curtis is incompetent to testify

at trial.  In the absence of a showing of inadmissibility, the Court determines that

no part of Curtis's affidavit should be stricken.

Thus, the Court takes into consideration the affidavits of Curtis and Lavey

in this Order.

## B.    Good Cause

Myers argues that Stryker did not have good cause to terminate him because Stryker did not adequately ground its decision in the facts, making his discharge unreasonable. The Court disagrees. The undisputed facts clearly establish that Stryker discharged Myers for acting unethically, unprofessionally, and in a manner likely to harm the company.

An employer's termination is wrongful if it was not for good cause. Mont. Code Ann. § 39–2–904(1)(b). "'Good cause' means reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reason." § 39–2–903(5). A legitimate business reason is "neither false, whimsical, arbitrary or capricious, and it must have some logical relationship to the needs of the business." *Buck v. Billings Mont. Chevrolet, Inc.*, 811 P.2d 537, 540 (Mont. 1991).

Under Montana law, a court may not substitute its judgment for an employer's discretion in employment matters: "[i]t is inappropriate for courts to become involved in the day-to-day employment decisions of a business." *McConkey v. Flathead Elec. Coop.*, 125 P.3d 1121, 1126 (Mont. 2005). An employer's discretion is greatest "where the employee occupies a 'sensitive'

managerial position exercising 'broad discretion[.]'" *Id.* (quoting *Buck*, 811 P.2d at 541). Deference to an employer's business judgment is particularly great when the employer must place substantial trust in the employee's decision-making. *Id.* at 1128.

Myers was a managerial employee. Serving as Sales Manager for Stryker's Northwest Branch, Myers oversaw the work of eight sales representatives and associates operating within Montana and northern Wyoming. Myers reported directly to Curtis, who was based in Denver. Within Montana and northern Wyoming, Myers had extensive discretion over the day-to-day business of the regional team. Additionally, Myers served as a liaison between higher management and employees operating within the region. It was important for Stryker to trust Myers's leadership, and Stryker had significant discretion regarding Myers's continued employment.

Myers's termination was for good cause if it was not "false, whimsical, arbitrary or capricious" and had "some logical relationship to the needs of the business." *Buck*, 811 P.2d at 540. The parties do not dispute the appropriateness of this standard, and they agree that Stryker's purported reasons for terminating Myers—harassment of employees and harm to customer relationships—meet its requirements. However, the parties disagree: (1) whether Stryker was mistaken as

to Myers's conduct; and (2) whether any mistake is relevant if Stryker was indeed mistaken.

The Court first considers the undisputed facts. Unless Myers's pretext argument, addressed separately below, is successful, there is no dispute that Stryker terminated Myers for its good faith belief that Myers harassed coworkers and damaged relationships with customers. Stryker conducted an investigation before Myers was terminated. As part of the investigation, Curtis and Lavey spoke with Myers's coworkers and customers. Following the investigation, Curtis and Lavey were concerned about Myers behaving unprofessionally within the organization and about him damaging relationships with customers. In their interviews with Myers's subordinates, Curtis and Lavey heard stories about Myers pressuring others to provide services to him in exchange for Myers's performance of his regular job duties. Employees from other sales divisions reported that Stryker's customers were considering leaving Stryker because they were unhappy with Myers. Doctors reported significant wrongdoing. Additionally, Myers was banned from a hospital for 30 days, and Stryker was concerned about the example this ban set for other employees, even though the violation leading to the ban was not particularly egregious.

Myers does not dispute the above facts. Instead, he argues that Stryker was

mistaken about his conduct. This argument is unavailing. Myers had the opportunity to seek positive evidence to raise a dispute, but he did not do so. He merely denied that the statements Curtis and Lavey attributed to his co-workers were truthful. He did not submit affidavits from his former co-workers or any other evidence aside from his bare assertions that the events described by the interviewees had not, in fact, occurred.

Further, even if every person with whom Curtis and Lavey had spoken was indeed mistaken about Myers's conduct, Stryker's trust in Myers was reasonably and irrevocably eroded. Myers was in a managerial position requiring the exercise of discretion. The Court cannot second-guess Stryker's decision to terminate Myers when there is no dispute that Stryker lost confidence in Myers after an extensive investigation performed in good faith. *McConkey*, 125 P.3d at 1128.

Rather than create a factual dispute, Myers raises a legal argument to support his position. Myers relies nearly completely upon *Marcy v. Delta Airlines*, in which the Ninth Circuit held that, under the WDEA, summary judgment for an employer is inappropriate when the plaintiff-employee introduces facts demonstrating that the employer's purported good cause reason was grounded in a mistake. 166 F.3d 1279 (9th Cir. 1999). In *Marcy*, the employee introduced positive evidence to show that her former employer was mistaken that she had

knowingly sought payment for hours unworked. *Id*. at 1287. The employer's investigation into the misconduct was minimal. *Id*. at 1282.

In response to Myers's citation to *Marcy*, Stryker relies principally on *Sullivan v. Continental Construction of Montana, LLC*, 299 P.3d 832 (Mont. 2013). In *Sullivan*, the Montana Supreme Court affirmed summary judgment for the employer when it terminated an employee based solely on its internal investigation into allegations of misconduct. The employer interviewed the plaintiff's coworkers, who reported that the plaintiff, a managerial employee, regularly demeaned and derogated his subordinates. *Id.* at 834. The employee could not raise a genuine issue of material fact by introducing evidence suggesting that some coworkers did not find his actions inappropriate. *Id*. at 836. The court distinguished *Marcy*, determining that an employee must offer specific positive evidence to argue mistake. *Id.* at 838. By offering evidence suggesting that he was a valuable employee who did not deserve termination, the employee in *Sullivan* did not successfully counter the "substantial conflicting evidence" uncovered by the employer in its investigation. *Id*.

The controversy here is analogous to that presented in *Sullivan*. Myers's mere assertion that Stryker is mistaken does not create a factual dispute. To overcome summary judgment, Myers would need to offer evidence that Stryker's

investigation was inadequate or specific positive evidence showing the presence of mistake. Myers has not met that burden. Summary judgment is appropriate for Stryker because the undisputed facts show that Stryker had good cause to terminate Myers for its good faith belief that Myers harassed coworkers and threatened valuable relationships with customers.

## C. Pretext

Myers argues that even if Stryker can show good cause, a factual dispute exists regarding whether Stryker's purported reason for the termination is a mere pretext. Myers asserts that Stryker terminated Myers as a scapegoat for the company's decision to terminate Auch. In response, Stryker raises two arguments: (1) that, even if Myers were correct in arguing pretext, Stryker would still have good cause to terminate Myers for suggesting Auch's termination; and (2) that Myers has presented only speculation in support of his claim of pretext. No genuine dispute of material fact exists on the question of pretext, and Stryker is entitled to judgment as a matter of law.

To defeat summary judgment on the issue of pretext, "the employee 'must prove that the given reason for the discharge . . . is a pretext and not the honest reason for the discharge.'" *Arnold v. Yellowstone Club*, 100 P.3d 137, 142 (Mont. 2004) (quoting *Mysse v. Martens*, 926 P.2d 765, 770 (Mont. 1996)). An employee

fails to meet his burden when he does not present some evidence in the record substantiating his claim of pretext; "mere denial or speculation will not suffice." *Johnson v. Costco*, 152 P.3d 727, 734–735 (Mont. 2007).

The undisputed facts demonstrate that Myers advocated for Auch's termination. Shortly after Auch's termination, two physicians contacted Curtis, frustrated with the decision; one withdrew all business from Stryker because of Auch's termination. Additionally, Myers's colleagues within separate divisions of Stryker contacted Curtis expressing concern about Auch's discharge and Myers's management style. In response to the negative feedback, Curtis sought to rehire Auch, but Myers refused. After Stryker discharged Myers, the company hired Auch again.

Although Auch's termination factored into Myers's discharge, Myers cannot point to facts in the record supporting his claim that Stryker unfairly turned him into a scapegoat for Auch's termination. Stryker has introduced evidence showing that Auch's termination triggered questions about Myers's suitability for employment and that it then conducted an investigation resulting in Myers's termination. Myers cannot produce evidence supporting his claim that Stryker did not base its decision to terminate his employment on both Myers's advice regarding Auch and on the results of the investigation. Instead, Myers relies

solely on "mere speculation." *Johnson*, 152 P.2d at 734.

Additionally, Myers has not adequately supported his argument that a pretextual discharge would have violated the WDEA. Myers asserts that he fully informed Curtis about the potential repercussions of Auch's termination in an attempt to minimize his responsibility. However, Myers is unable to dispute that Stryker's upper management was keenly dependent on his advice regarding his sales team because he was a regional manager with a direct connection to his sales team. Additionally, Myers can point to no evidence refuting Stryker's evidence that the discharge of Auch left Curtis feeling deceived and misguided by Myers. In the absence of such evidence, Myers has failed to substantiate his claim that Stryker discharged him for an improper purpose.

Thus, even if Stryker did terminate Myers for advocating for Auch's termination, Myers's claim of pretext would nonetheless fail because Stryker had a "legitimate business reason" to discharge Myers for precisely that reason. *Buck*, 811 P.2d at 540. Myers's actions threatened customer relationships and made Myers's coworkers uncomfortable. As a result of Myers's conduct, Stryker lost trust in him, and the company had the discretion to terminate Myers as a result. *McConkey*, 125 P.3d at 1126.

### D. Compliance with Company Policy

Myers claims that, even if Stryker had good cause to terminate him, the discharge was wrongful because it was in violation of Stryker's own personnel policies. Stryker moved for summary judgment on this theory of wrongful discharge, and Myers did not respond to defend his claim. Summary judgment is appropriate for Stryker on this theory.

Under Montana law, a discharge is wrongful if an employer "violated express provisions of its own written personnel policy." § 39–2–904(c). Stryker's written personnel policies clearly outlined Stryker's discretionary authority to terminate employees for violations of company rules or policies. Stryker determined, following its investigation, that Myers violated the company's code of conduct and employee handbook, both of which promote ethical conduct and prohibit harassment and other unprofessional behavior. Under Stryker's written policies, of which he was informed, Myers was not entitled to an interview before termination, as he alleged. Stryker fully complied with its written policies.

## II. BREACH OF COVENANT NOT TO COMPETE COUNTERCLAIM

### A. Choice of Law

As a threshold issue, the Court must decide whether to apply Montana or New Jersey law in construing the covenant not to compete. Stryker argues that

New Jersey law governs because the covenant provides for its application. Myers disagrees and asks the Court to apply Montana law. Because the Montana Supreme Court would apply Montana law under its choice of law analysis, the Court agrees with Myers.

A federal court sitting in diversity applies the choice of law rules of the forum state. *Alaska Airlines, Inc. v. United Airlines, Inc.*, 902 F.2d 1400, 1402 (9th Cir. 1990) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Here, Montana's choice of law rules govern whether Montana or New Jersey law applies.

Montana relies on the Restatement (Second) of Conflict of Laws § 187 to determine "whether to give effect to parties' contractual choice-of-law provisions." *Modroo v. Nationwide Mut. Fire Ins. Co.*, 191 P. 3d 389, 400 (Mont. 2008). Montana will apply the "law of the state chosen by the parties to govern their contractual rights" unless: "(1) but for the choice of law provision, Montana law would apply under § 188 of the Restatement; (2) Montana has a materially greater interest in the particular issue than the parties['] chosen state; and (3) application of the chosen state's law would contravene a Montana fundamental policy." *Polzin v. Appleway Equip. Leasing, Inc.*, 191 P.3d 476, 480 (Mont. 2008) (citing Restatement (Second) of Conflict of Laws § 187(2)(b)). For the exception

to apply, all three elements must be met. *Id.*

Element (1) is satisfied when Montana law "would apply absent the parties['] choice of law." *Id.* Montana analyzes this element under Restatement § 188, determining that it is met when a Montana court, "subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law." *Id.* at 481 (citing Restatement (Second) of Conflict of Laws §§ 6, 188). Pursuant to Montana Code Annotated § 28–3–102, a "contract is to be interpreted according to the law and usage of the place where it is to be performed, or if it does not indicate a place of performance, according to the law and usage of the place where it was made." Where a contract does not designate a place of performance, Montana looks to the place where the contract was negotiated and entered into. *Polzin*, 191 P.3d at 481.

Here, element (1) is satisfied. Myers's employment contract does not indicate a place of performance. Because Myers signed the agreement in Montana, where he performed nearly all of his job responsibilities, the contract was negotiated and entered into in Montana. If there had been no choice of law provision in the contract, Montana law would apply.

In analyzing element (2), Montana weighs five factors: "(a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of

20

performance; (d) the location of the subject matter of the contract; and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." Restatement (Second) of Conflict of Laws § 188.

Element (2) is also satisfied. The balance of factors indicates that Montana's interest in the employment contract is materially greater than New Jersey's. First, Montana is the place of contracting, as the contract was signed within the state, suggesting that Montana has a more significant interest in the dispute. Second, there is no evidence of negotiation of the employment contract on the record, and this factor tips neither for or against application of Montana law. Third, the contract was performed largely in Montana, where Myers did the vast majority of his work. Myers did no work within New Jersey, and the third factor weighs in favor of applying Montana law. Fourth, the subject matter of the contract is Myers's employment on behalf of Stryker. As with the third element, this element suggests that Montana's interest in the dispute is greater than New Jersey's because Myers's employment was substantially located within Montana and never within New Jersey. Finally, Myers was a resident of Montana, and Stryker was domiciled in New Jersey. The fifth and final factor does not influence the analysis. Montana has a materially greater interest in the controversy than does New Jersey.

The final element, element (3), is satisfied when application of the contractual choice of law provision would result in a violation of a public policy of Montana. *Masters Group Int'l, Inc. v. Comerica Bank*, 352 P.3d 1101, 1103 (Mont. 2015). Both New Jersey and Montana recognize restrictive covenants under certain circumstances. However, New Jersey is generally willing to enforce covenants not to compete, recognizing that, within that jurisdiction, "a seller's incidental noncompetitive covenant, which is designed to protect the good will of the business for the buyer, is freely enforceable in the courts." *Solari Indus., Inc. v. Malady*, 264 A.2d 53, 56 (N.J. 1970). On the other hand, Montana has clearly expressed a policy interest in encouraging trade and allowing individuals to freely seek employment, limiting enforceability of covenants not to compete. "Montana's public policy strongly disfavors agreements in restraint of trade[.]" *Access Organics, Inc. v. Hernandez*, 175 P.3d 899, 902 (Mont. 2008). Thus, applying New Jersey law to Stryker's counterclaim may well violate a public policy fundamental to Montana law. The Court applies Montana law.

## B. Enforceability

"Montana law strongly disfavors covenants not to compete." *Wrigg v. Junkermeier, Clark, Campanella, Stevens, P.C.*, 265 P.3d 646, 648 (Mont. 2011); Mont. Code Ann. § 28–2–703. Under Montana law, a contract that absolutely bars

a person from practicing her profession is void. *Id.* at 649. However, a contract that partially restrains a person from engaging in her business or occupation is reasonable and enforceable if each of three elements is met: "(1) The covenant should be limited in operation either as to time or place; (2) the covenant should be based on some good consideration; and (3) the covenant should afford reasonable protection for and not impose an unreasonable burden upon the employer, the employee, or the public." *Id.* (citations omitted).

Here, the first element is easily met. The covenant is limited in time to one year from the termination of employment. Further, it is limited in place to the geographic region covered by Myers during his employment at Stryker.

The second element is also satisfied. Good consideration means "[a]ny benefit conferred or agreed to be conferred upon the promisor by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered or agreed to be suffered by the person, other than prejudice that the person is at the time of consent lawfully bound to suffer, as an inducement to the promisor[.]" Mont. Code Ann. § 28–2–801. Where "an employer [provides] an employee with a raise or promotion in exchange for signing a non-compete agreement[,] . . . the salary increase or promotion serves as good consideration." *Access Organics, Inc.*, 175 P.3d at 903. Myers signed the covenant not to compete as consideration for his

23

promotion to a managerial position with additional compensation.

The third element is complicated somewhat when the employee is discharged. Myers cites to *Wrigg* to support his claim that covenants not to compete are per se unenforceable when the employer terminates the employee. This reading of *Wrigg* is inaccurate. *Wrigg* suggests that, while a covenant is generally unreasonable when the employer terminates an employee, the covenant will likely remain enforceable if the termination resulted from "conduct of the employee that has proven detrimental to the employer or the employer's clients." 265 P.3d at 506. In that situation, the employer must "establish the legitimacy of the business interest and the nature of the risk posed by the former employee's competition." *Id.* If the employer meets that burden, the question remains whether the covenant is otherwise reasonable in the protections it affords and the burdens it places upon the parties and the public.

Here, Stryker has demonstrated both that the covenant serves legitimate business interests and that the risk posed by Myers's competition is high. Stryker has legitimate interests in maintaining the confidentiality of its trade secrets and in protecting its relationships with trained employees and with repeat customers within the region. In fact, in *Wrigg*, the Montana Supreme Court expressly recognized the legitimacy of an employer's desire for protection from "an

24

employee appropriating valuable trade information, good will, and customer relationships to compete directly against—and take business from—his former employer." 265 P.3d at 651. Additionally, Stryker has demonstrated that competition with Myers may pose substantial risk to its legitimate business interests because his managerial duties gave him extensive access to the company's intellectual property and customer base.

Although Stryker has met its burden under *Wrigg*, the Court cannot determine that the covenant is enforceable or unenforceable as a matter of law. A question remains whether it "afford[s] reasonable protection for and [does] not impose an unreasonable burden upon the employer, the employee, or the public." *Wrigg*, 265 P.3d at 649. The reasonableness of a partial covenant not to compete presents a factual question for trial. *Mungas v. Great Falls Clinic*, 221 P.3d 1230, 1237–38 (Mont. 2009). Questions of fact remain as to the reasonableness of the protection afforded to Stryker and the burden imposed upon Myers. Summary judgment is not appropriate on the issue of enforceability.

## C.    Breach

Myers argues that, even if the contract is enforceable, summary judgment on the counterclaim is appropriate because there is no dispute that Myers did not breach the covenant. Myers argues that Stryker failed to prove damages and that

he has met his burden of showing the absence of dispute by specifically denying each of Stryker's allegations. Myers has not met his burden of showing the absence of a factual dispute, and summary judgment cannot be granted.

Myers's argument that Stryker failed to prove damages is unavailing. Stryker has supported its argument that, if Myers breached the covenant, he compromised valuable intellectual property and relationships with customers and employees. Additionally, Stryker has sought an injunction against Myers, a remedy specifically provided for in the contract. (Doc. 27–1 at 7.) Because a dispute remains as to whether Myers breached, a dispute remains as to Stryker's damages. Stryker has not failed to demonstrate a dispute of material fact on the issue of damages.

Myers claims that there is no dispute whether he breached the covenant. This argument similarly fails. The covenant provides that Myers would not work for a competitor where his services "could enhance the use or marketability of a Conflicting Product or Service by application of Confidential Information which [he] may have had access to during [his] employment." (Doc. 27–1 at 4.) At minimum, a dispute remains regarding whether Myers violated this provision in the contract when he accepted a position with Zimmer, Stryker's direct competitor. Summary judgment cannot be granted for Myers on Stryker's counterclaim.

Based on the foregoing, the Court finds that Stryker has met its burden of showing the absence of a genuine dispute of material fact on Myers's wrongful discharge claim and that Myers has not met his corresponding burden on Stryker's counterclaim. Thus, Stryker is entitled to judgment as a matter of law on the wrongful discharge claim, and Stryker's counterclaim remains contested.

## CONCLUSION

Accordingly, IT IS ORDERED that:

(1)     Defendant/Counter-Plaintiff Howmedica Osteonics Corp. d/b/a Stryker Orthopedics's Motion for Summary Judgment (Doc. 39) is GRANTED.

(2)     Plaintiff/Counter-Plaintiff Jeremy R. Myers's Motion for Summary Judgment on Defendant's counterclaim (Doc. 42) is DENIED.

DATED this 30th day of March, 2016.

Dana L. Christensen, Chief District Judge
United States District Court